### UNITED STATES v. COOKSEY et al.

(Circuit Court of Appeals, Ninth Circuit. October 3, 1921. Rehearing Denied Dec. 5, 1921.)

No. 3551.

1. **Public lands ⊕120—Burden on owner of land to establish defense of bona fide purchaser.**

In a proceeding by the United States to cancel a patent for land fraudulently obtained in violation of the provisions of Timber and Stone Act June 3, 1878, as amended by Act Aug. 4, 1892 (Comp. St. §§ 4671–4673, 4988, 10216), defendants had the burden of proof to establish their defense of bona fide purchasers.

2. **Public lands ⊕138—Person having knowledge of fraudulent seeking of public lands held agent of defendants, claiming as bona fide purchasers.**

In a suit by the United States to cancel a patent for lands fraudulently obtained in violation of the provisions of Timber and Stone Act June 3, 1878, as amended by Act Aug. 4, 1892 (Comp. St. §§ 4671–4673, 4988, 10216), a contract reciting that person obtaining the land fraudulently, or having knowledge that it was being obtained fraudulently, agreed to sell the land described, *held* an agreement whereby defendants engaged the services of such person as their agent to procure for them the title to the lands, so as to bring them within the rule that knowledge of agent is knowledge of principal.

3. **Principal and agent ⊕177(1)—Notice to agent notice to principal.**

Notice to or knowledge of an agent while acting within the scope of his authority and in reference to a matter over which his authority extends is notice to or knowledge of the principal.

Appeal from the District Court of the United States for the Second Division of the Northern District of California; William C. Van Fleet, Judge.

Suit by the United States against Edward L. Cooksey and others. Judgment for defendants, and the United States appeals. Reversed and remanded, with instructions.

This appeal, together with appeals in 23 companion cases, was taken from a decree dismissing a suit to cancel a patent for lands alleged to have been fraudulently obtained in violation of the provisions of the Timber and Stone Act (Act of Congress June 3, 1878, amended by Act of August 4, 1892 [Comp. St. §§ 4671–4673, 4988, 10216]). Cooksey's Case is taken as representative.

---

⊕For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The complaint alleges that the entryman swore falsely, in that he swore that he applied for land named in the application for his own benefit, whereas, before making his application, he had agreed to convey the land to the Curtis, Collins & Holbrook Company; that that company knew of the fraud and procured Cooksey to make the entry for its benefit. The defense of bona fide purchaser is relied upon. Upon reference, the master found that the entries had been made under prior illegal agreements between the entrymen and one Tuman, but that the Curtis, Collins & Holbrook Company had no notice of such illegal arrangements and was an innocent purchaser. The substance of the findings is:

In 1901, Tuman endeavored to interest C. H. Holbrook, Sr., in certain timber land in California. At that time persons owning lands within the limits of the national forests could reconvey them to the United States and select in lieu other lands of equal area outside of the national forests. In December, 1901, Holbrook, as party of the first part, and J. G. Curtis and T. D. Collins, as parties of the second part, agreed among themselves in writing as follows:

For a consideration of $1 from each of the parties to the other, and the promises contained, Holbrook agreed to sell Curtis and Collins 42,380 acres of timber land in California, and to have title vested in Collins and Curtis as in the manner set forth in the contract at $7.50 per acre. The timber lands were described in a schedule. Holbrook was to obtain title to the 42,380 acres of forest reserve land for which he was to receive from the United States a like quantity of the timber lands, title to be secured to Curtis and Collins in the following manner:

The forest reserve lands were to be deeded to Thompson, trustee, to be held in trust by him in pursuance of the terms of the agreement. Curtis and Collins were to deposit $200,000 in bank to be used in purchasing forest reserve land at not exceeding $5 per acre. Payments were to be made by the bank to the owner of the forest reserve lands upon proper certificate of a designated attorney and the trustee, upon the written request of Holbrook, was to deed the forest reserve lands to the United States and to make application for the timber land, and when title had been acquired to the timber land and upon notice from Holbrook that he had been fully paid, the trustee was to convey to Curtis and Collins, or to whomsoever they might direct. When title was acquired to the 42,380 acres, Holbrook was to be paid the balance of the purchase price named as $115,660, and should receive 789 shares of the stock of a corporation to be formed and certain sums in cash and the balance in interest-bearing promissory notes of Curtis and Collins. The corporation was to have a capital stock of $500,000, divided into 5,000 shares of $100 each, and Curtis and Collins were to deed the lands to the corporation, and 3,156 shares were to be issued to Curtis and Collins, 1,844 shares to remain in the treasury. Holbrook was to be a director and was vice president and general manager. It was further provided that, if Holbrook could not secure title to the whole of the 42,380 acres of land by forest reserve, he might secure such titles through any other legal means or source, but in no event should he or the persons deeding the same be paid for the lands thus acquired until the title thereto was certified to be good by the attorney and deeded to the trustee, and when so certified the bank should pay for the land.

Holbrook and his son acquired the necessary scrip, paying therefor from $3 to $5.50 per acre. Tuman was interested with Holbrook, but this was not generally known. When Holbrook reported that it was difficult to obtain forest reserve scrip, he advised Curtis and Collins that there were other valuable public lands, title to which could be secured under the Timber and Stone Law. Curtis and Collins were satisfied, provided good title would be obtained, and pursuant to oral agreement title was acquired under the Timber and Stone Law to about 30,000 acres, including the lands involved in these suits. The timber and stone entries were made through agents of Tuman. One of the agents was told by Tuman that money would be advanced, if necessary, to pay for the land, and that thereafter the entrymen could sell at a profit of $100 above all expenses, and the agent would receive a location fee of $25 for each claim that Tuman purchased. Such agreements were carried out, the money was furnished by Tuman, and when the land was en-

tered and the entryman was paid $100 above all expenses deeds were taken in the name of Charles E. Gregory, who was not known to the entryman, and whose name was used by Tuman and Holbrook. Nearly all the timber and stone entries were made in the last half of 1902, and the deeds to Gregory were made soon after proof by the entrymen, but were not recorded until June, 1904. Gregory deeded to the corporation, Curtis, Collins & Holbrook Company, but knew nothing about the lands and merely permitted his name to be used. The Curtis, Collins & Holbrook Company was organized August 14, 1902, the incorporators being J. G. Curtis and his son, D. G. Curtis, T. D. Collins and his son, E. S. Collins, Charles H. Holbrook' and his son, Charles H. Holbrook, Jr., and Irving F. Moulton. Gregory assigned the contracts involved to the company at different times up to 1904, but none of the deeds were recorded until October, 1909, and some were not recorded until 1910 and 1911. By direction of Holbrook, on May 2, 1903, Gregory conveyed the land involved in the Cooksey entry to Curtis, Collins & Holbrook Company, conveyance being made in pursuance of the contract already referred to between Holbrook and Collins and Curtis. The master found that about May 2, 1903, the corporation, in consideration of the conveyance to it, issued to Curtis and Collins its stock at the rate of $7.50 or $10 per acre conveyed; that Curtis and Collins paid to Holbrook a valuable consideration for the conveyance to the corporation; that on May 2, 1903, neither Collins nor Curtis nor the corporation knew or were charged with knowledge of the fraud, or of any fraud, and none of them knew or was charged with knowledge of fraud in the obtaining of the patent until 1908, and that therefore the Curtis, Collins & Holbrook Company at the time of the acquisition of the land conveyed by the patent was a bona fide purchaser for a valuable consideration, and without knowledge of any fraud against the United States.

S. W. Williams, Sp. Asst. Atty. Gen., of Pawhuska, Okl., for the United States.

Charles A. Shurtleff and J. G. De Forest, both of San Francisco, Cal., for appellees.

Before GILBERT, MORROW, and HUNT, Circuit Judges.

HUNT, Circuit Judge (after stating the facts as above). The evidence sustains the finding that Cooksey, entryman, acquired the tract involved by unlawful practices, in that he swore falsely when he made affidavit that prior to his entry he had not made an agreement whereby title to be acquired was to be conveyed to another person. Cooksey made final proof in October, 1903, and a few days afterwards conveyed to Gregory. The deed to Gregory was recorded September 10, 1904. Gregory, in May, 1903, conveyed to the corporation, and the deed was recorded in October, 1909. Gregory was ignorant of any fraud, though he was a trustee for Holbrook and Tuman; and, speaking generally of all the cases like Cooksey's, clearly Gregory as a grantee was a trustee for Holbrook and Tuman. But when we inquire into the attitude of Holbrook and Collins and Curtis, our conclusion is against that of the District Court.

Holbrook was vice president and general manager of the corporation from the time of its organization in August, 1902, until 1904 when he sold his stock to Collins. Holbrook drew checks of the corporation and signed them. Tuman said that Holbrook talked with him, was advised of what was going on, and knew that he was lending money to applicants for entries. The circumstances show that he did. Holbrook established a bank account at Susanville, Cal., and Tuman was au-

thorized to draw against the account. In October, 1902, $1,728 was drawn from an account in the name of Collins and Holbrook in a San Francisco bank, and like amount was put to the credit of Holbrook in Susanville a few days afterwards. Later in the same year other withdrawals from the same account in a San Francisco bank were made, and substantially equal sums put to Holbrook's credit in the Lassen County Bank. It is but a reasonable inference that this money was used by Tuman to make payments for entries.

Although Collins and Curtis lived in Pennsylvania, they, together with Holbrook and Tuman, looked at the lands and timber in 1902 after the contract was made. D. G. Curtis, Jr., who was treasurer of the company also frequently went upon the lands. Because of Tuman's claim that he was entitled to an equal interest with Holbrook in the enterprise, a quarrel arose which resulted in a suit by Tuman against Holbrook, filed in 1904, for half of the stock interest that Holbrook had received. T. D. Collins was instrumental in effecting a compromise of the suit whereby Tuman accepted 200 shares of stock in the company and $10,000 in money.

After the present suit was instituted Collins bought 200 shares of stock from Tuman, paying him $750 per share, a sum which Collins himself testified was much more than the stock was worth. The explanation given by Collins for paying such a high price for the stock was that he understood an outsider in whose integrity he had no confidence wished to buy the shares. When considered with the other circumstances, the transaction is suspicious. It is in evidence, too, that in 1904 and 1906 officials of the General Land Office were actively investigating entries of lands not involved in this case, but in the same vicinity, and which it was alleged by the officials had been sold to the Curtis, Collins & Holbrook Company. Tuman discussed the matter with Holbrook and testified that Holbrook was opposed to defending the entries. He also talked over the matter with E. S. Collins and T. D. Collins. T. D. Collins admitted that he had talked about these lands, but they were lost, and "that was all there was to it." Holbrook owned about 900 out of 5,000 shares of the capital stock of the corporation, and there are so many circumstances which go to show that he knew what Tuman was doing that it must be held that he had notice, actual or constructive, of fraud committed by Tuman, in the agreements made with the entrymen as to the titles, and that his knowledge is imputable to the corporation. Moreover, we cannot avoid the conclusion that T. D. Collins and J. G. Curtis, and their sons, were sufficiently informed of facts and circumstances to have put them upon inquiry.

[1-3] Appellees had the burden of proof to establish the defense of bona fide purchasers. Wright-Blodgett Co. v. United States, 236 U. S. 397, 35 Sup. Ct. 339, 59 L. Ed. 637. There the court distinctly held that one who pleads that he is an innocent purchaser without notice must establish affirmatively his defense, in order to defeat the right of the government to cancellation of a conveyance which fraud alone is shown to have induced. The same doctrine is laid down in Cooper v. United States, 220 Fed. 871, 136 C. C. A. 501; No. Colo. Coal Co. v.

275 F.—43

United States, 234 Fed. 34, 148 C. C. A. 50. And in our judgment it was error on the part of the master and of the District Court to consider the case as one where the burden was on the government to prove that the purchaser had notice of the fraud. The evidence is undisputed that the purchases of lands were made in pursuance of the contract between Holbrook, party of the first part, and Collins and Curtis, parties of the second part. By the terms of the contract there was an obligation upon the parties of the second part to deposit a large sum to be used, not by Holbrook, but by the bank, in payment for forest reserve lands, the lands to be deeded by the owners to the trustee and to be paid for by the bank upon Holbrook's certificate that the vendors were entitled to payment and the certificate of the attorney that the title was good.

While the contract in its first part recites that Holbrook promises and agrees to sell the land described in the manner set forth thereafter in the contract in reality the contract is one, and was carried out as one, whereby the parties of the second part engaged the services of Holbrook as their agent to procure for them the title to the lands referred to, the purchase price of the lands to be paid by the parties of the second part out of their own funds and to be paid, not to Holbrook, but directly to the vendors of the lands. The corporation took deeds from Gregory, but paid him no consideration whatever for the land. The purchase was not made from Holbrook and from Curtis and Collins individually, because neither Holbrook nor Curtis nor Collins had the title to the land and none of them were in possession thereof. In its real aspect the case is brought within the familiar rule that notice to, or knowledge of, an agent, while acting within the scope of his authority and in reference to a matter over which his authority extends, is notice to or knowledge of the principal. Mechem on Agency, § 1803.

We can find no substantial ground upon which to conclude that the case is excepted from the general rule. It follows that Holbrook's knowledge is imputable to his principals, and they must be held to have known of the method by which the title to the lands was acquired. No. Colo. Coal Co. v. United States, 234 Fed. 34, 148 C. C. A. 50.

The decree is reversed, and the cause is remanded, with instructions to enter a decree canceling the patent.

Reversed.