UNITED STATES of America,
Libellant,

v.

ONE 1955 MODEL BUICK COUPE AU-
TOMOBILE, Motor Number
10798026.

Civ. No. 827.

United States District Court
S. D. Georgia, Savannah Division.
Sept. 20, 1956.

Joseph B. Bergen, Asst. U. S. Atty., Savannah, Ga., for plaintiff.

Kirk McAlpin, of Bouhan, Lawrence, Williams & Levy, Savannah, Ga., for defendant.

SCARLETT, District Judge.

The libellant in the above styled case, the United States of America, filed a libel of information against the instant automobile alleging that the seized automobile had been used in violation of the Internal Revenue Liquor Laws after which a timely intervention was filed by the General Motors Acceptance Corporation alleging an interest in the seized automobile and praying for remission or mitigation of forfeiture should the automobile in question be forfeited inasmuch as it did not have knowledge or reason to believe that the automobile would be used in violation of the Internal Revenue Liquor Laws as prohibited under Title 18 U.S.C.A. § 3617(b) (2) and that its purchaser did not have a record or reputation for such violations which would require an inquiry as required under Title 18 U.S.C.A. § 3617(b) (3).

Subsequently a claim was filed for said automobile by its owner, Eleanor C. Arnold, denying knowledge of the alleged fact that her automobile had been used in violation of the Internal Revenue Liquor Laws and praying for its return.

Prior to the hearing of the libel action the claimant, Eleanor C. Arnold, dismissed her petition, thus leaving the General Motors Acceptance Corporation as the sole intervenor.

Thereafter, the Court heard evidence produced by the government to justify

forfeiture to the effect that the seized automobile had been used to transport materials used and intended to be used in the production of distilled spirits with intent to defraud the United States of the tax due on the distilled spirits produced and intended to be produced with said materials. The government also established that the automobile contained in its glove compartment a loaded P.38 caliber pistol together with a box of P.38 caliber cartridges and a box of .30–.30 caliber rifle cartridges. An order of forfeiture was entered and the court proceeded to hear the question of whether the intervenor was entitled to remission or mitigation.

The intervenor placed on the witness stand Dale Critz, the president of Critz Buick Company who established that his company had sold the seized automobile to Eleanor C. Arnold, and that an interest was transferred to the General Motors Acceptance Corporation through the assignment of a Conditional Sales Contract to G.M.A.C. and for the purpose of attempting to establish the fact that Critz Buick Company had no knowledge or reason to believe that the automobile would be used in violation of the Internal Revenue Liquor Laws. In making the assignment, Mr. Critz denied that his company acted as an agent for G.M.A.C. However, Mr. Critz testified on cross-examination that the Conditional Sales Contract assigned to G.M.A.C. was assigned the same date of the sale and in all probability during the time of the sales transaction under what is known as the G.M.A.C. Retail Plan. The consideration of the assignment was that Critz Buick Company guaranteed the full amount remaining unpaid thereon. The provisions of the assignment to General Motors Acceptance Corporation of the Conditional Sales Contract further provides that General Motors Acceptance Corporation specifically requests and authorizes Critz Buick Company to procure insurance against the contingency of the death of the purchaser of the forfeited automobile and that such insurance shall be payable to Critz Buick Company in an amount equal to the balance remaining to be paid under the contract which shall be applied in payment of the obligation under the contract to the extent of such proceeds. General Motors Acceptance Corporation in consideration of such agreement waives and releases Critz Buick Company from any and all claims to all such rights, benefits or advantages as may accrue under such insurance. Mr. Critz acknowledged that the Conditional Sales Contract form and the assignment form, all of which is embodied in the same instrument, was made up and printed by G.M.A.C. for his company's use. On further cross-examination, Mr. Critz acknowledged that the purchase of the seized automobile from the factory had also been financed by G.M.A.C. under what is known as the G.M.A.C. Wholesale Plan which enables dealers to carry an adequate stock of cars without tying up too much of their working capital. Reference was then made to the G.M.A.C. manual, which was later introduced into evidence by the government, and which states the foregoing purposes for which the G.M.A.C. Wholesale Plan was designed and which states that the G.M.A.C. was organized for the purpose of providing a specialized financing service to General Motors automobile dealers. The Wholesale Plan finances the purchase of cars by the dealers from the General Motors factory and arranges for necessary insurance on these cars until the time of their subsequent sale to an individual purchaser who may finance through General Motors Acceptance Corporation on their Retail Plan. The Wholesale Plan allows the dealers to demonstrate these dealer financed cars but only under strict control. The manual sets out the conditions for G.M.A.C. responsibility under the retail plan assignments, one of which being that an investigation must be made by the dealer and such investigation indicated that the customer was not engaged in any business or occupation that is in violation of the State or Federal Laws and that the vehicle be used exclusively by the customer. It was pointed out that the manual states that the G.M.A.C. Retail Plan of financing constitutes an essential and effective

sales aid to the dealer and reduces the possibility of outside influence which might divert or delay the sale. The manual identifies the G.M.A.C. Retail Plan as the dealers' time payment plan and states that the benefits accruing from the use of the G.M.A.C. Retail Plan gives dealers a tangible and direct interest in promoting the facilities for time payments under the plan. The manual compares its plan with bank financing by stating that the benefits of its plan will be sacrificed if through indifference or neglect of the opportunity to make an installment sale dealers are satisfied to let their customers pay cash with borrowed money since the dealer is left with the unprofitable trade-in part of the deal and none of the plus values of the G.M.A.C. Retail Plan when a bank takes over the financing.

The government continued to bring out on cross-examination the contents of the G.M.A.C. manual and showed that the manual provides that in order to get the most effective use of the G.M.A.C. Retail Plan an individual in each dealership would be designated to act as a specialist in this phase of the dealer's car sales and that the individual must be carefully selected and thoroughly trained to utilize his contacts with prospective car purchasers to present as convincingly as possible the benefits and advantages of the installment payment facilities offered by the dealer under the plan. The manual establishes that G.M.A.C. would assist in training the specialist and would provide the dealers with posters, customer folders and other sales aids. The manual then states that it is more convenient for the customer to have the dealer make installment terms part of the car sale and that the time buyer from a dealer who uses the G.M.A.C. Retail Plan has the benefit of the dealer's continued interest reflected in the dealer's readiness to recommend any changes in payments that may prove desirable or further assist by accepting payments for transmission for G.M.A.C.

Upon completion of the testimony of Dale Critz the intervenor placed on the stand James T. Crane, the Savannah Manager of General Motors Acceptance Corporation, who testified that G.M.A.C. had no knowledge of the intended use of the seized automobile or that the purchaser, Eleanor C. Arnold, had a record or reputation for violating Internal Revenue Liquor Laws although an inquiry had not been made as required by federal law at the time of the purchase of the seized automobile. Mr. Crane then testified that the Savannah office of G.M.A.C. had an oral agreement with Critz Buick Company that Critz Buick Company was relieved of the responsibility of making an investigation concerning the possible record or reputation of purchases of automobiles financed on the G.M.A.C. Retail Plan and that such inquiry would be made by G.M.A.C. instead. Mr. Crane made reference to the G.M.A.C. manual and contended that the dealer's responsibility to G.M.A.C. in event of default, such as in the instant case, was terminated because the seized automobile was not repossessed by G.M.A.C. and returned to the dealer within ninety days after default. On cross-examination the government pointed out that said provision further provides that the dealer shall remain responsible under the guarantee for payment in any case where G.M.A.C. is unable to repossess a vehicle due to dealer's failure to have obtained a proper certificate of title when required by state law or due to circumstances constituting a breach of the dealer's guarantee as to title to the vehicle in the assignment of the retail contract covering same and impairing or barring G.M.A.C.'s right to repossess the vehicle.

The government in rebuttal pointed out that it had previously established through its witness, John Guy, Agent for the Alcohol Tax & Tobacco Unit of the Department of Internal Revenue, that the purchaser, Eleanor C. Arnold, had a reputation for allowing her husband B. P. Arnold to use her automobiles in the illegal whiskey business. Mr. Guy testified that in addition to the seized automobile, B. P. Arnold had also used a 1954 Oldsmobile belonging to his wife in violation of the Internal Revenue Liquor Laws. The evidence established that the

1954 Oldsmobile was the car that Eleanor C. Arnold had traded in on the seized automobile in question.

The government then called Leonard B. Wittfield, who was the sales representative that sold the seized automobile to Eleanor C. Arnold. Wittfield established that he negotiated the sale of the vehicle in question and that he completed the sale by delivering the car to Eleanor C. Arnold at her place of employment. Wittfield testified that B. P. Arnold accompanied his wife during a part of the negotiations. Then the government attempted to establish through Wittfield that he had knowledge of B. P. Arnold's reputation in the community for dealing in non-tax-paid liquor at the time of the instant sale. The witness denied such knowledge and Joseph B. Bergen, the Assistant United States Attorney prosecuting the case for the government, took the witness stand, under oath, and testified that he had occasion to be at Critz Buick Company on personal business shortly after the seizure of the forfeited vehicle and during a casual conversation with Wittfield, Wittfield stated he had known B. P. Arnold for some time and he had known that B. P. Arnold was engaged in the illegal liquor traffic, and that as a matter of fact had actually seen B. P. Arnold deliver moonshine whiskey to a Negro grocery store located directly across the street from Critz Buick Company prior to the sale of the forfeited vehicle.

The evidence having been completed the court heard oral argument from the government and from counsel representing the intervenor. After argument, briefs were submitted by both parties.

The government argued that the General Motors Acceptance Corporation had constructive knowledge or reason to believe that the forfeited automobile would be used in violation of the Internal Revenue Liquor Laws since the evidence revealed that Critz Buick Company acted as an agent for the G.M.A.C. in financing the car in question and that Critz Buick Company through its sales representative had actual knowledge or reason to believe that the car would be used. The government also argued that in addition to the fact that the intervenor failed to comply with Section 3617(b)(2), the intervenor failed to comply with Section 3617(b)(3), Title 18 U.S.C.A. requiring inquiry concerning the reputation of a prospective purchaser for violating Internal Revenue Liquor Laws since the purchaser had a reputation for allowing her bootlegger husband to use her automobile in violation of those laws. The government then submitted for the court's determination the question of whether it has jurisdiction to hear a petition for remission or mitigation in this case since it appeared that the forfeited automobile contained a loaded P.38 pistol and extra pistol and rifle cartridges and in view of Title 26 U.S.C.A., § 5685(c), which provides that a vehicle containing "any explosives" when violating any law of the United States shall be forfeited, and related Custom Law sections, Title 26 U.S.C.A., § 7327, providing that such forfeiture is to be remitted by administrative action only. The court was requested to establish the meaning of Section 5685(c) in the light of Section 5848 of Title 26, which excludes pistols or revolvers and .30 caliber rifles with barrels longer than 18 inches from such forfeiture.

The intervenor argued that the purchaser of the forfeited automobile did not have a reputation for violating the Internal Revenue Liquor Laws since the record established that it was her automobile and not her that was suspected of being used in liquor dealings and that reputation under the statute refers to the person and not the vehicle.

In regard to the question of knowledge, the intervenor then argued that the personal knowledge on the part of the dealer's salesman that the purchaser's husband was engaged in illegal liquor deals was not imputed to the intervenor since the salesman was a commissioned salesman drawing no salary and could not approve the terms of such a sale without first submitting the contract to the sales manager for his approval and since Critz Buick Company was a completely inde-

pendent entity and not operated by or under General Motors Acceptance Corporation. The intervenor further argued that under the contractual relationship with G.M.A.C. it had no dealer responsibility to reimburse G.M.A.C. for the forfeited automobile since the car had not been returned to the dealer within ninety days after default as required by the G.M.A.C. manual. The intervenor denied that the G.M.A.C. manual created a principal-agent relationship between G.M.A.C. and Critz Buick Company.

### Findings of Fact and Conclusions of Law

This court is of the opinion that it has jurisdiction to hear the intervenor's petition for remission or mitigation of forfeiture and that said petition should be denied.

 Jurisdiction is retained in the instant case even though the code sections pertaining to remission or mitigation of forfeitures which are related to Section 5685 provide for administrative mitigation of the forfeiture of vehicles containing "any explosive". The term explosive as used in the Internal Revenue Code must be construed in the light of common understanding since there is no statutory definition in the code itself. The word explosive in the every day use of the word refers to a substance used for powerful destructive force such as blasting which is detonated by means of special devices other than objects used as personal weapons. Explosives as commonly understood, do not include pistol or rifle cartridges, since the word has been construed not to cover specific things which do explode or contain explosive material. Explosives cause a simultaneous or destructive explosion of its packing or casing, and such is not the case with pistol or rifle cartridges. See: Wechsler v. State, 124 Ohio St. 461, 179 N.E. 356, and Schwartz v. Northern Life Insurance Company, 9 Cir., 25 F.2d 555. The term as used in the Internal Revenue Code means explosives commercially used or sold as such rather than articles, which, although they do contain some explosive material, are commonly known by another

designation. See Henderson v. Massachusetts Bonding and Insurance Company, 337 Mo. 1, 84 S.W.2d 922.

In determining the intention of Congress at the time the Internal Revenue Code of 1954 was enacted, cognizance should be taken of the fact that Congress had previously excluded small-arms ammunition in any quantity from Section 832, Title 18 U.S.C.A., making it unlawful to transport within the limits of the jurisdiction of the United States on any common carrier passenger vehicle for hire operating in interstate or foreign commerce any high explosive, and it did not see fit to specifically include small-arms ammunition in the definition of "any explosive" in the subsequent legislation. Furthermore, it is reasonable to conclude that since Congress intended to exclude pistols or revolvers and certain rifles from forfeiture and the finality of administrative discretion on this question of remission or mitigation, it certainly must have intended to exclude loaded pistols or revolvers and specified rifles in view of the failure to make a distinction between the two.

 Concerning the contention by the government that the intervenor had knowledge or reason to believe that the forfeited vehicle would be used in violation of the Internal Revenue Liquor Laws, this court finds that the sales representative for the dealer had actual knowledge of the fact that the purchaser's husband who accompanied the purchaser in negotiating the purchase of the forfeited automobile had a reputation for violating such laws. It is not necessary to comment on the salesman's denial of this fact other than to say that it is obvious that he felt that his best interest lay in making such denial.

The Fifth Circuit Court of Appeals in the case of Beaudry v. United States, 106 F.2d 987, 988, which was supported by the United States Supreme Court, held that the knowledge of an agent who sold automobiles on a commissioned basis was imputed to the dealer.

"The rule to be applied here, when appellant (dealer), has deliver-

ed the car and has taken the benefit of his agent's (salesman's) acts in making the sale, by taking its proceeds, is, that he cannot take the benefits of the act without also taking the burdens resulting from the agent's knowledge and intentions. Curtis Collins & Holbrook Co. v. United States, 262 U.S. 215, 43 S.Ct. 570, 67 L.Ed. 956; Morris v. Georgia Loan Co., 109 Ga. 12, 34 S.E. 378, 46 L.R.A. 506; Connecticut Fire Ins. Co. v. Commercial Nat. Bk. of San Antonio, 5 Cir., 87 F.2d 968." (Parenthetical insertions added.)

This decision, of course, follows Georgia Code, Section 4–309 which states:

"Notice to the agent of any matter connected with his agency shall be notice to the principal."

The decision also recognizes Georgia Code, Section 4–311 which states:

"The principal shall be bound for the care, diligence, and fidelity of his agent in his business, and hence he shall be bound for the neglect and fraud of his agent in the transaction of such business."

There appears to be no doubt that Critz Buick Company was charged with the knowledge concerning the fact that its agent Wittfield had reason to believe that the forfeited automobile would be used in violation of the Internal Revenue Liquor Laws. Automobile dealers must calculate the risk that there are certain salesmen who in their zeal to make a sale and receive a commission will neglect to reveal information concerning the prospective purchaser that would lead the dealer's sales manager to disapprove the transaction.

The next question concerns whether the knowledge of Critz Buick Company was thence imputed to the General Motors Acceptance Corporation who financed the forfeited vehicle. The case of United States v. 1938 Buick Sedan, D.C.N.Y., 24 F.Supp. 739, held:

"Where finance company financing conditional sale of automobile relied entirely on the seller of an automobile as to character and financial responsibility of buyer and as to whether there was any reason to believe that the [purchased] automobile would be used in connection with liquor violations, the seller was an agent of the finance company in such matters, and the seller's lack of good faith and knowledge that the automobile * * * would be used by husband in connection with violations of the liquor laws, would be imputed to the finance company, as respects right of finance company to obtain a remission or mitigation of the forfeiture of the automobile for violations of the internal revenue laws relating to liquor."

It should be noted that the facts in the above New York case are identical to the facts in the case now before this Court and such knowledge was determined to be imputed to the finance company as alleged in this case.

Although the finance company intervening here attempted to establish that it had relieved the dealer of the responsibility of supplying the information concerning whether there was any reason to believe that the purchased automobile would be used in connection with liquor violations since it would assume that obligation, the evidence shows that the financing company did not assume this obligation. The evidence, however, does show that the policy manual of the G.M.A.C. places that responsibility on the dealer and there is no provision allowing a local G.M.A.C. office to alter this policy.

The business relationship of Critz Buick Company with the intervenor, G. M.A.C., which was set out as policy in the G.M.A.C. manual complementing the provisions of the standard G.M.A.C. Conditional Sales Contract assignment form further shows without question that the contractual relationship with the purchaser of the forfeited automobile was a joint venture for the benefit and profit of both G.M.A.C. and Critz Buick Company with Critz Buick Company acting as agent for G.M.A.C. in every respect, and that knowledge gained in the busi-

ness dealings between purchaser and Critz Buick Company concerning the sale of automobiles to be financed by G.M.A.C. is imputed to G.M.A.C. Since the intervenor is charged with such knowledge the court would be precluded from exercising its discretion in remitting or mitigating the forfeiture under Title 18, Section 3617(b) (2).

The Circuit Court of Appeals, Eighth Circuit of Iowa, in the case of Federal Motor Finance v. United States, 88 F.2d 90, appealed from United States v. One Studebaker Commander 8 Coupe, D.C., 13 F.Supp. 619, held that:

"Where bootlegger purchased automobile through an agent (ostensible purchaser) who apparently was acting in his own behalf, and finance company bought agent's note and conditional sales contract without knowledge that the agent was acting for bootlegger, finance company held not entitled to remission or mitigation of forfeiture of automobile for violation of internal revenue laws." (Parenthetical insertion added.)

The facts in the Studebaker case also show that the salesman had knowledge that would lead one to believe that the automobile would be used in violation of the Internal Revenue Liquor Laws, and that such knowledge was imputed to the finance company. The Court in the Studebaker case then cited United States v. One 1935 Chevrolet Coupe, D.C., 13 F.Supp. 986, 988, which held that the same General Motors Acceptance Corporation which had bought a conditional sales contract in good faith after having been furnished with the usual customer's statement and after making inquiry about the character and financial responsibility of the signer of the contract, was not entitled to remission or mitigation because:

"* * * knowledge of the irregular transaction is imputed to them (GMAC) and they are charged with it (the knowledge) only because it was the knowledge of their agent (dealer)." (Parenthetical insertion added.)

The case of C, I. T. Corporation v. United States, 4 Cir., 86 F.2d 311, held that where a claimant seeking remission of forfeiture whose interest did not arise out of an agreement with the person who had a reputation for violation of the Internal Revenue Liquor Laws and hence was under no duty to make inquiry as such reputation under Title 18, Section 3617(b) (3), the claimant "* * * may not shut its eyes to facts [concerning the probable use of the automobile] which in the course of transaction come to its attention." In other words, as in the instant case, the automobile salesman cannot overlook the fact that a purchaser's husband who assisted in the negotiation of the purchase of an automobile by his wife was known to the salesman to be in the bootleg or moonshine liquor business.

In deciding the question of whether the lack of good faith and the knowledge of the dealer should be imputed to the claimant finance company, the Court in United States v. One Chrysler Sedan, D.C., 18 F.Supp. 684, 687, in a case identical to this, held:

"* * * the claimant must be held to knowledge of facts known to the dealer, whether disclosed to the claimant or not."

\* \* \* \* \* \*

"The finance companies can ordinarily avoid a situation such as the one existing in this case by making investigations through others than through the dealer who sells the automobile and desires to negotiate the conditional sales contract signed by the purchaser. An independent investigation would have disclosed that Michael "[Daylight]" Tramantan was the husband of Ann Tramantan [the purchaser]; that they were living together; that Michael Tramantan was a racketeer and a bootlegger, and that the automobile would be used (as it was) in the violation of the law."

Even though the intervenor attempted to establish that the purchaser of the forfeited automobile, Eleanor C. Arnold,

did not have a record or reputation for violating the Internal Revenue Liquor Laws and therefore they were not required to make an inquiry as to such record or reputation as required by Section 3617(b) (3), the reasoning in the foregoing cases would preclude remission or mitigation. However, the government went further than necessary and established through its witness, John Guy, that Eleanor C. Arnold, had a reputation for allowing her husband, B. P. Arnold, to use her automobiles in the illegal whiskey business.

■■ Under Federal Law a person who aids and abets in the commission of an offense is, of course, guilty as a principal, Title 18 U.S.C.A. § 2. Therefore, it naturally follows that a person who aids and abets in the violation of Internal Revenue Liquor Laws has a reputation for violating the Internal Revenue Laws as contemplated under Section 3617 (b) (3). There is little doubt that Mrs. Arnold was aware of the fact that her husband, with whom she was living, as in the Chrysler case, was engaged in activities outside of the law. This knowledge is also borne out by the fact that Mrs. Arnold filed a claim for her forfeited automobile in which she denied knowledge that her husband used the automobile in such a manner and then she dismissed this claim prior to the hearing. The claimant's failure to maintain this position and her failure to take the stand at the time of the hearing and so testify is a circumstance under which the Court may construe an admission of the alleged knowledge. The Fifth Circuit Court of Appeals in Williams v. United States, 199 F.2d 921 held as follows:

"In libel against a truck, automobile and certain other property alleged to have been intended to be used in violation of the Internal Revenue Code, failure of defendants to take stand to explain or attempt to explain circumstantial evidence against them was a circumstance which could be considered against them."

The intervenor cited the case of General Finance & Thrift Corporation v. United States, 5 Cir., 226 F.2d 735, 737, as authority for remission or mitigation since the Court of Appeals held in that case that the finance company was not charged with the responsibility of looking behind the ostensible purchaser of a financed automobile to ascertain whether the transaction was forged or spurious. The facts of the General Finance & Thrift Corporation case are not parallel to the facts of the case decided here. The ostensible purchaser of the automobile in the General Finance case did not have a record or reputation for violating the Internal Revenue Liquor Laws and the Government and the intervenor stipulated that the dealer had no knowledge or any intimation that any person other than the ostensible person had any interest in the car at the time the sale was consummated and the conditional sales contract was sold and transferred to claimant. The Court held that under the stipulated facts the dealer and finance company were acting in good faith and that, therefore, in the stipulation in and by which the parties agreed, the claimant had no knowledge or reason to believe that the vehicle was being or would be used in violation of the liquor laws. The Circuit Court of Appeals held that the District Court in its findings and conclusions " 'based on the aforesaid stipulation' " erroneously found and concluded that the dealer was the agent of the finance company and the dealer was charged with the knowledge of the fact that the car was being purchased by someone other than the ostensible purchaser who had a reputation for violating the revenue law and that the finance company was also charged with such knowledge. The salient points were that the Government in the General Finance case stipulated that the finance company had no reason to believe that the vehicle would be used in violation of the liquor laws and that since the Government was not basing its objection to remission or mitigation on such knowledge the Court of Appeals held that the plaintiff was entitled to remission or mitigation because the finance company

was not required to investigate the record or reputation of the purchaser of the forfeited automobile if such purchaser did not possess a record or reputation for violating the liquor laws even though he be the ostensible purchaser and not the real purchaser.

The intervenor then attempted to claim relief from the conditions of General Motors Acceptance Corporation's responsibility, as stated, by citing a provision in the General Motors Acceptance Corporation manual which relieves the dealer of his guaranty for payment of the outstanding balance in the event of default by the purchaser unless General Motors Acceptance Corporation repossesses the vehicle and returns it to the dealer within ninety days after default. This provision has nothing whatsoever to do with General Motors Acceptance Corporation being charged with the dealer's knowledge or the dealer acting as an agent for General Motors Acceptance Corporation, but deals only with the indemnity of General Motors Acceptance Corporation by the dealer in case of a loss. In any event, the provision would not apply because the vehicle was seized by lawful process and, therefore; the dealer could not bind General Motors Acceptance Corporation to terms requiring return of the vehicle before indemnifying General Motors Acceptance Corporation.

This being the case, the consideration of the assignment, which was that Critz Buick Company guaranteed the full amount remaining unpaid on conditional sales contract, may be considered by the court in applying its discretion because of the equitable proposition that should remission be denied the intervenor can recover any loss from the dealer whose negligence put the case in court. The Fifth Circuit Court of Appeals in United States v. Williams, 200 F.2d 500, held that such indemnity may be considered by the court as a reason to deny remission of mitigation.

**Order Denying Remission or Mitigation and Judgment**

Wherefore, since the intervenor failed to comply with both Section 3617(b) (2) and 3617(b) (3) of Title 18, and since a failure to comply with either one of these sub-sections would preclude the court from allowing remission or mitigation,

It is ordered, adjudged, and decreed that the petition for remission or mitigation be, and the same is, hereby denied, and that judgment be entered, delivering said vehicle to the Regional Commissioner, Internal Revenue Service, United States Treasury Department, Atlanta, Georgia, pursuant to application for such delivery filed in the office of the Clerk with costs and expenses of this action taxed against the intervenor.